Good morning, your honors. My name is Derek Newman. I represent the appellant Dave Lahode. I'd like to reserve five minutes in rebuttal. I'll keep track of the time. Okay. May it please the court, Mr. Lahode was found liable in the court below for violation of the Anti-Cybersquatting Consumer Protection Act, or the ACPA, and this court should reverse for at least three reasons. Was he found liable for violating anything else, or is this only as it comes to us in an ACPA case? He was also found liable for trademark infringement in a violation of Washington's Consumer Protection Act. So we've got a Lanham Act case, and we've got a Washington Consumer Act case, too, as well? Yes, your honor. Okay. Thank you, and we believe that the court should reverse on those basis as well, but I'm going to limit my argument to the ACPA. Okay. And the first argument is concerning... And you're limiting it because if you succeed in persuading us on the ACPA, those arguments, per force, apply to the others. Is that the idea? That's correct, your honor, and I'd be happy to address those other issues if the court has questions. Okay. The ACPA provides that when there is a distinctive trademark and a domain name registrant registers a domain name with the bad faith intent to profit off that mark, namely the distinctive trademark, which must be distinctive at the time of registration, then there's liability. So there's two elements. There's bad faith and there's distinctiveness, and we believe that the court below erred both on the bad faith element and the distinctiveness element. I'd like to start with bad faith. Can someone be held liable for bad faith in the absence of distinctiveness? No. Okay. The interesting thing about the court's summary judgment opinion is that in order for bad faith to be found, there first has to be a trademark. Not just any trademark. A trademark that is distinctive at the time of registration of the domain name. Is it fatal that the trademark in existence at the time of filing in 2003 for the domain name by Mr. Lahouty, that the trademark was only a trademark under Georgia law? Does that matter that it was only a Georgia trademark, or is a Georgia trademark protected under the act? It matters because under United States law, there can only be one trademark owner for any given class of goods or services. And in this case, there were lots of parties that were using VeriCheck to identify the source or quality of verification of check services, one of which had a registered trademark with a presumption of nationwide validity, which put the burden on the respondent to overcome that presumption. And without overcoming that presumption, it was impossible for the respondent to have any trademark rights whatsoever. Let me make my question a little more precise or maybe nuanced. Assume for a moment that the Arizona trademark doesn't exist. It did exist. Sometime during the course of litigation, it expires and so on. Assume for purposes of my question that it doesn't exist. I'm just asking a straightforward statutory construction question. The statute, the ACPA, protects trademarks. Does it protect a state trademark? No, Your Honor. Period. Under no circumstances. Well, if it's used in interstate commerce and is therefore a federal common law trademark, it may qualify for protection. But under Your Honor's hypothetical, where it's just a Georgia trademark protected by Georgia law, it wouldn't fall within the purview of the Lanham Act. And even if it were a common law. I didn't ask the Lanham Act. I asked about the ACPA. The ACPA is part of the Lanham Act, which is why I referenced it. It's Section 1125D of the Lanham Act. As a practical matter, if we're dealing with the Internet, then clearly the activities cross state lines, do they not? Well, assuming that there is marketing and there's commerce that crosses state line, then Your Honor would be correct. But in the event that all the activity. The evidence here was that the company had customers outside of Georgia, didn't it? There's allegations of that. Well, allegations or what was the proof at trial? At trial, there was self-serving testimony of the CEO that there were customers outside the state. Self-serving testimony is evidence. And apparently it was persuasive evidence. Yes, Your Honor. The court found that there was evidence of that. So I was just trying to clear the underbrush. Thank you. And I think the underbrush is clear that he could have a protected trademark within the meaning of the ACPA, even if the only thing he has is a Georgia trademark, provided there is some interstate use. And we've got evidence on the record that it's interstate use. So I think that says to me, okay, I've got to go to the question as to whether or not this is a distinctive mark. Yes, Your Honor. Okay. And I'd like to first start with bad faith because I think it's an easier issue to resolve. And then I'd address distinctiveness unless Your Honor would like me to move straight to distinctiveness. But bad faith is not enough alone. There has to be the bad faith intent to profit off, the statute uses the words, that mark, meaning the mark belonging to the respondent in this case. And here, there was no evidence presented to the trial court, and certainly no evidence that was cited in the summary judgment opinion resolving issue, that Mr. Lahode knew of this trademark or knew that this Georgia company that claimed it ever existed. And without that nexus between the alleged bad faith and the alleged trademark, there can be no violation. What do we do with the fact that it seemed to influence Judge Robart that Mr. Lahode, A, had done this before? So we're dealing with a recidivist in the mind of the court. Secondly, that he went out and registered hundreds of different names and then tried to profit off of them by redirecting, in the case of Varachek, inquiries to someone else for which he received remuneration. Why isn't that kind of a classic case of bad faith? Well, Your Honor reviews some of the factors that courts consider in determining bad faith. I think I'm reviewing the evidence that was before Judge Robart that he relied on in his summary judgment order. Is your position that's not enough? Yes. Why is that not enough to show bad faith? In order to find bad faith, there has to be a nexus, a link between the bad faith and the respondent and its trademark. In this case, the trademark, which wasn't distinctive at the time of registration, in fact, the United States Patent and Trademark Office found after the time of Mr. Lahode's registration that that mark wasn't distinctive. We have to find a connection where my client, Mr. Lahode, knows of the trademark, or at least the Georgia company, and there's no evidence suggesting that he did. The fact that he perhaps registered hundreds of domain names does not lead to the conclusion that he'd ever heard of Varachek Georgia or the Varachek trademark. I think the argument can be summarized, just because he robbed 100 banks doesn't mean that he robbed this bank. That is correct, Your Honor. And in certain circumstances, for example, if you have a famous trademark that everybody's heard of, like Disney or Kodak or Xerox, and somebody registers a name that's confusingly similar, and there's no doubt that the party at issue has heard of the trademark, we look at the factors as to what would indicate bad faith. Has he registered other domain names? But here, we respectfully suggest that you don't look at those factors, because the reasonable person in the place of Mr. Lahode would never have known of this Georgia company or its trademark. And the reason I bring up reasonableness... Why don't you have the prior of fact conclude that Mr. Lahode is acting like an ostrich, that he's basically burying his head in the ground, and he doesn't want to do any research, because he's gone out and he's registered all these names, and he doesn't care whether there might be legitimate owners out there who have distinctive marks. He's going to do what he's going to do. And why can't that be a factor that the court can consider in determining that he's acting in bad faith? For two reasons, Your Honor. First, there has to be some evidence that suggests a link where Mr. Lahode knew about Respondent Ord's trademark. And second, there's the safe harbor provision of the ACPA, which provides that bad faith shall not be found in any case where the person who registers a domain name has reasonable grounds to believe the domain name was a fair use or otherwise lawful, which is why I was beginning to transition into asking whether a reasonable person in the place of Mr. Lahode would have thought it was a fair and lawful use. But why can't you turn that around and ask, wouldn't a reasonable person conduct a minimal amount of research in order to determine whether he might have inadvertently registered somebody else's mark? Thank you for suggesting that. And the evidence shows that at the time he registered the mark, there were dozens of parties using the term VeriCheck, which indicates that no single person had the exclusive right to use VeriCheck, and therefore it's free for the world to appropriate. Did he do the research to make that determination or not? Now you've got me confused as to what the facts are. Yes. There was evidence at trial that indicated he did a search and found an Arizona company. And also, he registered this domain name. Can I interrupt for just a minute? There's some self-serving testimony in a trial that he says he did the research and he found lots of uses of VeriCheck by lots of companies and nothing by the Georgia company. Correct. And now is the self-serving testimony evidence? Well, the answer is yes. The answer is yes. And it's uncontroverted testimony that there were lots of users. In light of the fact finder's verdict, why should we view that evidence in the light most favorable to your client? Why shouldn't we view it in the light most favorable to upholding the fact finder's decision? This Court is reviewing a summary judgment order. It has to draw all inferences in favor of Mr. Lahody. And there was no evidence that the Georgia company was searchable or paramount. Are we talking about trial testimony? Are we talking about summary judgment declarations? I thought Judge Fletcher asked you about trial testimony. I did say that, but it was a mistake. And with respect to the distinctness of the trademark, we looked at trial testimony. But the bad faith was found on summary judgment. Time's running on us. Can we get to the distinctiveness question? Because for me, that's, I think, where the case stands or falls. Your argument is that this is not inherently distinctive. And why do you say that? Well, other courts have reviewed marks similar to this. The Mark Barachek is a compound mark. It has two words, vary for verification and check for checks. The Second Circuit reviewed a case that was similar. It looked at arthritic care at 964 F. Second, 1338. Arthritic care is for pain gel used to treat arthritis. That was found to be descriptive. The Seventh Circuit looked at telemed. Tele is in telephone. Med is in medical for a remote medical analysis service. The Seventh Circuit found that was descriptive. In New York, they found that bufferin for buffered aspirin is descriptive. And if telemed is descriptive for remote medical analysis service and arthritic care for pain gel used to treat arthritis, then certainly varicheck is descriptive for verification of check services. And if we were to disagree then with the district judge, the district judge who found that this is inherently distinctive, and we were to hold, you know, this is descriptive, this is not suggestive, we then have to go on to secondary meaning. What evidence, if any, is in the record on secondary meaning? That's a softball question, Your Honor. I know it is. Because there is no evidence of secondary meaning in the record. There's no evidence of pervasive advertising. There's not testimony from a single consumer. There's no evidence of having lots of consumers. And, in fact, there's evidence of lots of parties using varicheck. Can I interrupt again? Was there an invitation, or let me put it this way, was the course of the trial such that if we were to hold that this is not distinctive and secondary meaning was required, that we can hold it against the other side for not having put it in? Or was the course of the trial and presentation such that they realized that they didn't have to? Although I wasn't trial counselor present there, I reviewed the record, and it indicates that there was no testimony or any evidence whatsoever going to secondary meaning. That was not my question. I apologize, Your Honor. Would you be so kind as to repeat the question? Well, my question is that I'm trying to figure out whether there was some basis at trial for the other side to think that it didn't have to put on the evidence. The judge was going to find that there was distinctive meaning, and, therefore, they didn't have to go to the next question. No, the burden was on the respondent to provide evidence that it had a distinctive trademark. At the time of the registration of this domain name, no evidence was submitted, and, therefore, it was essentially conceded. I would like to reserve the remaining time for rebuttal, if Your Honor would allow. Thank you. Good morning, Your Honors. I'm Shannon Jost for Vericheck. I want to, unfortunately, bring us back into the thicket with respect to the distinctiveness of marks and the basis for protection under U.S. law. The very premise of U.S. trademark law is that protection as a trademark is based on use, not on registration. There is no dispute that Vericheck has used the Vericheck mark since at least as early as 1992. How do you deal, counsel, with your opponent's argument, relying on the Second Circuit case with Arthriticare or Telmed? How do you deal with those precedents saying those contractions are not distinctive? I think it's tempting to try to put together two columns of marks and to look at courts that have held a mark to be distinctive or suggestive. I think within the Ninth Circuit itself, we can look at the Cerf-Viver case, for instance. Cerf, obviously, having something to do with beach. Viver being the second part of the word survivor. This court looked at that mark and found that it was suggestive. Yeah, what does it mean? It is evocative of a product having to do with beach products, and that's exactly what the plaintiff in that case produced. A similar mark... Cerf-Viver, that's to say surviving in the surface, suntan lotion? Exactly. That sounds suggestive to me. Sunscreens, that kind of a thing. Air care, the Ninth Circuit found, was suggestive as applied to products that would clean the air. Vericheck, looking at that, the district court very carefully assessed whether the mark was descriptive or suggestive. First, it's impermissible to parse a mark in terms of determining its distinctiveness. We need to look at the mark as a consolidated mark. Here, even if you consider the parts, veri is not a common English word. It has no separate meaning. It could be short for any number of things, as the district court considered, and the word check has a multitude of meanings as well. There was no evidence that a consumer looking at the word vericheck would instantly, without need for an exercise of imagination or creativity, come to the conclusion that vericheck... I still have my same question. How do you deal with the Second Circuit precedent on arthritic care? Or the telemed precedent? Do you just say the Ninth Circuit has different law and we have a circuit split? Or do you say the law is not really different? And I'm trying to understand how those cases are reconciled with the determination of distinctiveness. I think we have to look at each mark and each set of goods and services to which the mark applies as a separate case. And it is a highly intensive factual issue. It's a mixed question of law or fact, whether a particular mark is distinctive. I think we just have to say the court, in those circumstances, looking at that mark and those particular goods, came to the conclusion that the mark was descriptive. Here, we're looking at a different mark and different goods, and we can still apply the same law, which is, taken as a mark, does the consumer view the mark as instantly and immediately describing the goods and services or a characteristic of them? Or is there a need for some exercise of imagination or creativity to come to that conclusion? Here, I think we look at Vericheck, as the district court did, and say that one must exercise some level of creativity, even if small, to understand what the mark means. Is there anything in the record that tells us how many companies are operating in the United States using the name Vericheck? Not trademark, but just using the name Vericheck? I think we have to change the question slightly. You can answer my question, and then you can change it. Sure, I will answer that. There is some evidence of presumptive third-party use that was introduced by Mr. Lahody. What do you mean by presumptive third-party use? In fact, presumptive is probably a bad word. The evidence as to the Arizona company, for instance, Mr. Lahody has attempted to rely on that as a use of the term Vericheck by this Arizona company. Mr. Lahody does not own those registrations. That's yet a different question. What I'm after is, what evidence is there in the record that tells us how many companies in the United States, either in 2003 when the domain name was taken by Mr. Lahody, or later, which is relevant for the other statutes, were or are using the name Vericheck for their company? I haven't counted them up, but I think it's about seven, none of which both predate my client Vericheck's adoption. And what did those companies do that used those names? They do a variety of things. I'll say, though, there is not evidence that they used the mark. No, no, no. I'm after this question of distinctiveness, because I'm trying to figure out, if there are a lot of companies out there using the name Vericheck and they do some version of verification of checks, that tells me a little bit about whether it's descriptive or whether it is suggestive. Sure, and they use Vericheck formatives in connection with a wide range of things, background services, pre-employment investigations. I think there was something having to do with environmental quality. We don't see that they're all using them in connection with financial transaction processing services. But importantly, I think counsel misstated the rule in that there can be multiple uses of a mark in connection with a variety of goods and services. And we need to look at priority of use. Our client, there's extensive evidence in the record that Vericheck began use of its mark in 1992. There's no evidence of any third-party user who entered the market before 1992 and who used its mark in connection with financial transaction processing services, as did my client. But how does that go to the question of distinctiveness versus suggestive? Or descriptive versus suggestive, I should say. Sorry. I think it goes to both strength and distinctiveness. The presence of other users of a mark in connection with totally unassociated goods and services supports a finding that a mark is suggestive rather than descriptive because it suggests that consumers, when they see that mark, are not preconditioned to instantly assuming that it's associated with one particular good or service versus another. If we were to hold that Vericheck is not inherently distinctive, that is to say, if we were to hold that it's descriptive rather than suggestive, is there enough evidence in the record from which we could conclude that there is a secondary meaning? Would we have to send it back to the district judge for more evidence, more fact-finding? What do we do if we get to that stage? There is evidence in the record that Vericheck has used the mark for more than 18 years, that it has used it in connection with hundreds of thousands of transactions worth millions of dollars nationwide through over 100 independent sales offices. In regard to Judge Fletcher's question, he's asking if there's evidence of a secondary meaning, which I would think normally would not be shown just by use. It would be shown by some evidence of what consumers think. You're right. There can be different types of evidence that would support secondary meaning, and certainly testimony of a consumer is one type of such evidence. But the court is also entitled to look at the scope and nature of use of the mark, including the length of time that it's been used, the volume of sales that have been conducted using the mark, the scope of exposure of the mark to consumers. And we do have in the record the testimony of Mr. Ben Goretsky. It was declaration testimony at the summary judgment level. But he certainly testified as to the degree of recognition, at least to his knowledge, within the industry of the mark. Could I pose a question which may be a little off the trail? It's been on my mind. Am I right that the damages that were set for the ACPA violation were maybe $100,000? That's correct. But the attorney's fees that were awarded were over $300,000? That's not correct. The attorney's fees award, I don't have the exact number in mind, but I believe it was around $100,000 or even maybe a little bit lower than $100,000. Oh, okay. Yeah. That makes more sense. I think if you look at the progress of the case, it's probably not an unreasonable number. But I think this issue of distinctiveness of the mark is critical. I think it is, too. And let me ask another question. You've said that there's some evidence in the record that would go to the question of secondary meaning. If we were to hold that you need secondary meaning in order to show distinctiveness, would you want to rest on the record you now have, or would you wish to introduce more testimony, more and more evidence? Our preference would be a remand to the district court. But I think there is certainly evidence as to secondary meaning in the record already. But the district judge didn't rule on that basis. No, because the district court, in looking at whether the mark was suggestive or descriptive, found that the mark was suggestive. And a suggestive mark is an apparent misstatement. And that was enough for him, right. And analytically, that's clearly right. If it is suggestive, that's the end of that inquiry. Exactly. And I will comment on the standard of review. I think that appellant misstated the standard of review in their papers. The Ninth Circuit has repeatedly held that the issue of likelihood of confusion is reviewed for clear error. That's the secondary meaning question. Well, distinctiveness is part of the likelihood of confusion analysis. But is the question as to whether or not this mark is suggestive or descriptive, is that a matter of law or is that a finding of fact? It's a mixed question of law and fact. One can certainly – So I'm trying to figure out what the standard of review is on that one. I believe it's clear error because that is the standard that is applied to the likelihood of confusion analysis, which also is – I'm inclined to think that it's de novo. It's an expression of law and fact. We read it. He reads it. There wasn't a lot of evidence that goes into that beyond just reading the words. Well, de novo or is it mixed? Is it clear error as to the facts that he found and then de novo with regard to the application of the law to those facts? I think that's what it would be. And I looked back at Levi – Maybe that's the way to do it. I looked back at Levi Strauss and I looked back at Eclipse, where the court was looking at the overall likelihood of confusion analysis, which is a mixed question of law or fact. And there the review was error as to the facts. But as I read the case law on the pure question of is this suggestive or is this descriptive, as I look at the courts of appeals, they don't always say what they're doing in terms of de novo review or whatever, but it sure looks like de novo review. They're saying, no, as we understand this, this is suggestive or this is descriptive. They're not saying, well, we defer to the district judge on clear error. I've yet to see that one. I think you're right. I think the issue of distinctiveness of the mark is rarely a standalone issue. It's usually part of either the Fleetcraft analysis or part of the overall 43D analysis. Am I correct that there's no circuit court precedent that says that when a mark has a contraction in it, let's say less than a full word, so it's not in the dictionary, that that's necessarily suggestive? That's part of what the district court said here, but I didn't see any precedent from us or another circuit saying that that's like a rule of law that can be generally applied. I think there is a wealth of precedent, including Survivor, that considers whether a word or a combination of word parts has a distinct meaning as a standalone word, as part of the equation as to whether a mark is suggestive or descriptive, and certainly the absence of a plain English meaning is indicative of maybe something other than descriptiveness. It's one factor, but we couldn't go so far as to say that any time there's a contraction, it's necessarily suggestive. I don't think so. I don't think you could say that in the other direction, though. I look, for instance, at the Second Circuit's decision in the Playtex case that wet ones, and wet obviously has a meaning, moist, ones is perhaps evocative of the fact that you select them one by one, but wet ones, as applied to moist towelettes, was viewed as suggestive, not as descriptive, because the term wet ones could conceivably describe, as the Vericheck word does here, a range of different products. Thus, consumers, when they encounter that mark in the marketplace, don't immediately assume that it means one product rather than another. Yeah, but wet one versus wet check, once you say check, that's a little more precise than one. So if this were to be a question of Vero one, oh, well, I need a leap on that one. Well, again, I think perhaps looking at the long list of definitions for the word check, there's more than 40 of them, and certainly if we look at background check, which was one of the third-party uses suggested by Mr. Lahody, we look at another Vericheck used in connection with environmental review services, check can be understood by consumers to mean a multitude of things, not just the traditional fashion piece of paper. That's a fair point. I think one of the most powerful arguments that Lahody tries to make, he is entitled to rely on the validity of these third-party registrations. That flies in the face of Section 33 of the Lanham Act, which very clearly says that the owner of a mark who is a party to the action may rely on that registration. Mr. Lahody doesn't own those registrations. The owner of those marks, those now expired marks, is not a party to this action. And the district court correctly found that there was no evidence in the record at all showing that that Arizona company ever used that mark. In fact, Mr. Lahody testified, although the district court found he had credibility issues, that when he did a thorough investigation concerning who was using the Vericheck mark in the 1998-2003 time period, he found that that Arizona company wasn't using a mark. The district court also, I think, fairly believed that Mr. Lahody, having said that he thoroughly investigated who was using a Vericheck mark, very likely stumbled across my client, Vericheck, and was disingenuous when he said that he didn't know about my client when he adopted the domain name registration in 2003. Okay. Thank you very much. Thank you. When looking at bad faith, I'd like to return to that issue. In the event that a court finds that a party had reasonable grounds to believe that a domain name could be used fairly and lawfully, then bad faith shall not be found. This is a safe harbor provided by statute. In this case, a reasonable person in the place of Mr. Lahody would have believed it was fair and lawful to register and use Vericheck. A reasonable person would not have heard of the respondent in this case. A search for Vericheck at the time of this registration revealed lots of Verichecks. Does a reasonable person mean a reasonable person who's previously been found to have engaged in cyber squatting? I think we have to attach some significance to the fact that your client is not just some innocent person coming down the pike using somebody else's mark. We would have to respectfully disagree with Your Honor in that regard. The court cannot consider that? I believe that the safe harbor provision, which talks about reasonableness, refers to the average reasonable person in the place of the domain name registrant. A reasonable person would believe that it's fair to register this name when it had been registered for six years before by a third party without any objection. You've got somebody who's been tangled up with the law once before doing it again. That doesn't strike me as the same kind of a reasonable person who hasn't done it before. What Your Honor suggests is that once found liable for cyber squatting, the person can never again register another domain name or any person who comes forward. You have to be especially careful, more careful than the reasonable man that you're trying to cloak him with. And Mr. Lahode was very careful. And for the reasons that bad faith was found when there wasn't first found a distinctive trademark, and because the mark has to be distinctive at the time of registration, there wasn't evidence suggesting that, we respectfully request that this court reverse. Let me ask you a question that I think is not relevant to the merits here, but nonetheless it made me curious. I see from the briefing that Mr. Lahode is a Californian. Yes. And Verichek is a Georgia company. Why is this suit brought in Seattle? The Anti-Cyber Squatting Consumer Protection Act, strike that. There's an arbitration procedure that one can exercise when they'd like to refute a domain name called the Uniform Domain Name Dispute Resolution Procedure, or the UDRP. And the UDRP provides that the party that loses may file an action where the domain name registrar is located. In this case, the domain name registrar is a company called Enom, which is based in Bellevue, and that's the reason for jurisdiction in this court. Both parties consent when they engage in the UDRP procedure to that jurisdiction. That's part of the answer as to why there's jurisdiction here. My question actually is further than that. Okay, having jurisdiction here, why choose Seattle? Well, Enom is based in Bellevue, and the UDRP provides that it's filed with a registrar, that would be Enom, is located. So it's pursuant to rules which are essentially a contract between the parties. And so there was no choice but to file in Seattle is what you're telling me? The UDRP allows for filing where the registrant is located or the registrar. Mr. Lahode chose to file where the registrar is located, and I don't know as I stand here today, nor is there evidence, trial, as to why he picked this up. Nobody's fighting about this. I'm off on a far luck of my own on this. There's no bearing on the merits of the case. So is he a resident of the Central District of California? He is. And that was where he suffered the prior adjudication of cyber-squatting, right?  That may be the real reason. We could speculate, Your Honor. Yes, we certainly can. Okay. Thank you, both sides, for a good argument. Thank you. Lahode v. Varachek now submitted for decision. We're in adjournment for the day.
judges: Fletcher, Gould, Tallman